IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. AJA GARDNER, | § § | |
| *Plaintiff,* | § § § | SA-20-CV-00860-OLG |
| vs. | § § § | |
| SOUTHWEST INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| *Defendant.* | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns Defendant's Motion for Summary Judgment [#38]. All pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#53]. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendant's motion be **granted**.

**I.  Background**

Plaintiff Dr. Aja Gardner, who is African American, filed this action against Defendant Southwest Independent School District ("the District"), alleging that she was the victim of race discrimination, retaliation, and a hostile work environment during her tenure as the founding principal of CAST Stem High School. (Compl. [#1].) In her Original Complaint, Gardner asserted causes of action under Title VI, the Fair Labor Standards Act, and violations of her right to free speech, equal protection, and due process pursuant to 42 U.S.C. § 1983. (*Id.*) The

1

District moved to dismiss, and in response Gardner amended her pleadings, adding claims for discrimination and retaliation under Title VII. (First Am. Compl. [#17].)

The District again moved to dismiss, and in response Gardner filed her live pleading, the Second Amended Complaint, asserting causes of action only under Title VI and Title VII. (Second Am. Compl. [#24].) The District then filed a third motion to dismiss, asking the Court to dismiss the Title VI claim and Gardner's Title VII claims for national origin discrimination, hostile work environment, and retaliation. The District Court granted the motion in part, dismissing Gardner's hostile work environment claim and retaliation and denying the motion as moot as to Gardner's Title VII national origin discrimination claim and her Title VI claim, as Gardner had averred in her response to the motion to dismiss that she was no longer pursuing these claims. (Order [#32].) Because the District did not move for dismissal of Gardner's Title VII claims for race and color discrimination, the Court determined those claims should proceed.

The District now moves for summary judgment on Gardner's sole remaining claims of Title VII race and color discrimination. Gardner has filed a response in opposition to the motion [#45], to which the District has filed a reply [#48]. The motion is ripe for review.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174.

### III.  Summary Judgment Record

The summary judgment record contains evidence of the following facts, which are undisputed unless otherwise noted.[1]  Gardner applied for employment with the District in March of 2017 for a high school or middle school principal but was not selected for the position. (Verstuyft Aff. [#38-6], at ¶ 2.)  Subsequently, in May 2017, Gardner was asked to interview for

---

[1] The District has filed objections to some portions of Gardner's summary judgment evidence, arguing that multiple statements in Gardner's declaration are inadmissible hearsay and speculative or lacking in evidentiary foundation.  The undersigned has addressed some of these objections in the recitation of the summary judgment record and resolved certain specific objections.  Any statements from Gardner's declaration not addressed in the recitation of the summary judgment record were not relied upon by the undersigned in issuing this report and recommendation and, therefore, the objections to that evidence are dismissed as moot.

the principal position for a newly opening specialty high school, Southwest CAST STEM.  (*Id.*; Recommendation [#38-8], at 1.)  The District hired Gardner as the inaugural Principal on June 13, 2017, with a start date of July 1, 2017.  (Verstuyft Aff. [#38-6], at ¶ 2.)  Gardner was hired under a one-year probationary employment contract with a daily rate of $392.38.  (*Id.*)

The 2017–2018 school year was utilized to plan for the new CAST STEM High School's first ninth grade cohort, which would enroll for the 2018–2019 school year.  (*Id.* at ¶ 3.)  Gardner contends that from the beginning of her employment, she was unsupported by the District and sabotaged by Assistant Superintendent, Dr. JoAnn Fey.  (Gardner Decl. [#45-3], at 1–12.)  According to Gardner, there was no onboarding for her position, as Fey (her point of contact for the position) was out of the country in Singapore on her start date.  (*Id.* at ¶ 5.)  Additionally, upon Fey's return sometime in the fall of 2017, Gardner contends she was subjected to a racially hostile meeting involving professional threats from Fey.  (*Id.* at ¶ 6.)  Gardner testified in her deposition that at the meeting Fey told Gardner that she "understood people like [Gardner], African Americans, because when she was a coach at Southwest, she dealt with girls who were just like [Gardner]."  (Gardner Dep. [#38-3], at 134:2–12.)  Gardner also testified that at the meeting Fey flouted her power and authority to fire Gardner by saying, "I'm sure you think I called you in because I want to fire you."  (*Id.* at 133:8–10.)  Gardner asserts that she shared her concerns about these comments with both Lloyd Verstuyft, Superintendent of Schools for the District, and the CAST Network, but her concerns were not addressed.  (Gardner Decl. [#45-3], at ¶ 6.)  Gardner contends that Verstuyft decided to move Fey from her role in Curriculum and Instruction to Human Resources in the spring of 2018, meaning Fey and her colleagues would be essential to the opening and running of CAST STEM High School and directly involved in managing personnel issues at the school.  (*Id.* at ¶ 10.)

At the beginning of the 2018–2019 school year when the first cohort of students arrived, the District contends a number of personnel issues directly attributable to Gardner arose. (Verstuyft Aff. [#38-6], at ¶ 4.) Gardner in contrast contends that the dysfunction at her school stemmed from Fey, who pressured Gardner to hire unqualified individuals and denied personnel requests, forcing Gardner to assign existing employees tasks they were not equipped to handle. (Gardner Decl. [#45-3], at ¶ 10.)

It is undisputed, however, that several employees brought concerns to the attention of Human Resources and Central Office Administration regarding the work environment at CAST STEM High School during the 2018–2019 school year. (Verstuyft Aff. [#38-6], at ¶ 4.) One of these individuals was Dr. Nnenna Wilson, Academic Dean of CAST STEM High School. Wilson filed a formal grievance against Gardner on February 8, 2019. (Wilson Grievance [#45-7], at 1–5.) The grievance accused Gardner of creating a hostile and toxic work environment, in which ridicule, condescension, public criticism, and fear tactics were the norm. (*Id.* at 1–5.) The grievance also referenced the recent resignation of Secretary Tammy Butler and similar challenges experienced by Master Teacher Arthur Celestin, who had left the school in June 2018. (*Id.* at ¶ 6.)

In the weeks leading up to Wilson's grievance, however, Gardner had formally counseled Wilson on alleged issues with her performance and professionalism in the workplace. On January 11, 2019, Gardner issued a "Letter of Concern" to Wilson, which formally communicated Gardner's concerns surrounding allegedly "unprofessional comments" made by Wilson.[2] (Ltr. of Concern [#45-5], at 1–8.) Again on February 8, 2019 (the same day Wilson

---

[2] In Wilson's Grievance, she states that she first brought her concerns about the hostile work environment allegedly created by Gardner on January 10, 2019, and that it was the

5

filed her grievance), Gardner issued Wilson a "Cumulative Memorandum of Concern," documenting and communicating concerns about Wilson failing to meet the expectations of her position. (*Id.* at 3–8.) At this time, Gardner also placed Wilson on an Employee Intervention Plan, requiring Wilson to read a book and report on the main skills gained from the reading and to seek professional development in certain areas. (Employee Intervention Plan [#45-6], at 1–4.) Wilson ultimately did not participate in the Employee Intervention Plan, however, as Fey decided to transfer her to Legacy High School, another school in the District. (Gardner Email [#45-8], at 1.)

The record contains correspondence from Secretary Butler and Master Teacher Celestin regarding their issues with Gardner as well. Butler wrote a letter to Fey on February 8, 2019, regarding the "real reason" she chose to resign her employment from CAST STEM on January 28, 2019. (Butler Resignation [#45-10], at 1; Butler Ltr. [#45-11], at 1–10.) The letter indicates that she could no longer work for Gardner due to the anxiety created by the abusive and hostile work environment. (Butler Ltr. [#45-11], at 1–10.) Master Teacher Arthur Celestin made a similar statement to Human Resources on February 11, 2019, "explaining the real reasons [he] left CAST STEM in June 2018 before [he] could even finish [his] contract." (Celestin Statement [#45-9], at 1–7.) In the letter, Celestin states that he endured a "horror" under Gardner's leadership, involving mistreatment and abuse, ultimately leading to physical illness from the stress and toxicity of the environment. (*Id.* at 1.) Verstuyft investigated the allegations and, after talking with both Butler and Celestin, reached the conclusion that both employees left CAST STEM because of how Gardner treated them. (Verstuyft Aff. [#38-6], at ¶ 4; Verstuyft Ltr. [#38-14], at 1–7.)

---

following day that Gardner turned around and wrote her up for unprofessionalism. (Wilson Grievance [#45-7], at ¶ 8.)

Later that month, on February 25, 2019, Gardner filed a Level III Grievance, alleging she had suffered multiple instances of bullying and relentless harassment over the past 18 months by Fey. (Verstuyft Ltr. [#38-14], at 1–7; Gardner Grievance [#45-4], at 1–10.) Verstuyft met with Gardner formally about the grievance on March 7, 2019. (Verstuyft Ltr. [#38-14], at 1–7.) Following the meeting, Verstuyft hired Gary Patterson, a former Texas superintendent, as a third-party investigator to look into the issues between the CAST STEM administration, key campus personnel, Central Office staff, and Gardner. (Verstuyft Aff. [#38-6], at ¶ 5.) Patterson interviewed multiple staff members and Gardner as part of his investigation and concluded that there was a "troubling level of dysfunction at the campus leadership level" at CAST STEM High School. (*Id.*; Patterson Report [#38-15], at 6.) Given the seriousness of the allegations, Patterson recommended additional leadership training for Gardner but also suggested the District consider transfer, reassignment, nonrenewal, or termination of Gardner. (Verstuyft Aff. [#38-6], at ¶ 5; Patterson Report [#38-15], at 7.) Gardner believes the Patterson investigation was flawed, because he predominantly interviewed Fey's witnesses, and believes the report was biased and contradictory. (Gardner Decl. [#45-3], at ¶ 14.) Thereafter, Gardner was provided with a one-on-one leadership coach, Carol Mendenhall. (Verstuyft Aff. [#38-6], at ¶ 6.)

The following school year, five more grievances were filed against Gardner. (*Id.* at ¶ 7.) Teacher Anastosios Peppas filed a grievance against Gardner on November 15, 2019, which led to his transfer to another campus.[3] (*Id.*; Peppas Grievance [#45-13], at 2–9.) Mental Health Counselor Robert Victoria filed a grievance on December 20, 2019, alleging he was working in a

---

[3] Gardner contends that the grievance filed by Peppas was considered a joke by Human Resources prior to this lawsuit being filed and asserts that the grievance was dropped following his transfer from CAST STEM. (Gardner Decl. [#45-3], at 5.) The District objects to Gardner's statement as speculative and hearsay. The objections are sustained.

hostile work environment (impliedly contributed to by Gardner) and suffering from medical issues caused by the environment. (Verstuyft Aff. [#38-6], at ¶ 7; Victoria Grievance [#45-14], at 2–5.) Victoria requested a transfer but ultimately resigned on January 16, 2020, before any transfer could be granted, after an investigation into his complaint found his allegation of a hostile work environment was unfounded and that there were issues with Victoria's work performance. (Verstuyft Aff. [#38-6], at ¶ 7; Victoria Grievance Response [#45-14], at 6–10.) Executive Director of Special Education Robert Robinson filed a grievance against Gardner on February 26, 2020, alleging "unprofessional and discriminatory behavior toward special education staff and students," resulting in the failure to provide access to services. (Verstuyft Aff. [#38-6], at ¶ 7; Robinson Grievance [#45-15], at 2–5.) Robinson withdrew the grievance after being instructed through counseling to work through the issue.[4] (Verstuyft Aff. [#38-6], at ¶ 7.)

Teacher Sharlie Porter filed a grievance on March 2, 2020, alleging Gardner subjected her to "unwarranted public criticism" and undermined her authority with students, as well violated state law by refusing to allow teachers their statutory conference period, and created an "unbearable" workplace. (*Id.*; Porter Grievance [#45-17], at 2–13.) In response, Gardner issued a memo accusing Porter of misspending funds; this allegation was investigated by District leadership and found to be unsubstantiated. (Verstuyft Aff. [#38-6], at ¶ 7.) Porter ultimately requested and was granted a transfer from the CAST STEM campus.[5] (*Id.*) Teacher Magalia

---

[4] Gardner believes Dr. Fey was behind Robinson's complaint, as the complaint was never signed or dated. (Gardner Decl. [#45-3], at 8.) The District objects to Gardner's statement as speculative. The objection is sustained.

[5] Gardner alleges she coached Porter through significant performance issues, and Porter's complaints were found to be baseless. (Gardner Decl. [#45-3], at 6.) The summary judgment record reflects that the District investigated Porter's grievance and issued a formal response on July 31, 2020, after Gardner was no longer employed as Principal of CAST STEM, in which the

Rodriguez filed a grievance on March 4, 2020, alleging emotional distress and anxiety related to the work environment at CAST STEM High School.[6] (*Id.* at ¶ 2; Rodriguez Grievance [#45-18], at 6–8.) Finally, teacher Ramon Valdez resigned at the end of the 2019–2020 school year after he complained about the negative environment and leadership at CAST STEM High School. (Verstuyft Aff. [#38-6], at ¶ 7.) During the same two-year period of 2018 to 2020, Southwest High School and Southwest Legacy High School had no grievances or teacher requests to speak with Human Resources about personnel issues or the campus environment and had approximately 10 times the students and staff of CAST STEM High School. (*Id.* at ¶ 9.)

In response to these issues, Verstuyft decided to reassign Gardner to another school after the return from Spring Break in March 2020. (*Id.* at ¶ 10.) However, due to the onset of the COVID-19 pandemic around that same time and the transition to a remote model of learning, the conversation was delayed until May 21, 2020. (*Id.*) At the May meeting, Verstuyft informed Gardner that the District was extending her administrative contract for the 2020–2021 school year but was reassigning her to another administrative position in the District. (*Id.*; Reassignment Ltr. [#38-21], at 1.) She was reassigned to an Assistant Principal position of a middle school with a daily pay rate of $343.23. (Reassignment Ltr. [#38-25], at 1.)

After her reassignment, Gardner filed a grievance alleging discrimination and retaliation with the District. (Verstuyft Aff. [#38-6], at ¶ 12.) In the grievance, Gardner requested the following remedies: (1) reversal of her reassignment to a different administrative position; (2)

---

District found that some of Porter's complaints were unfounded. (Porter Grievance Response [#45-17], at 11–13.)

[6] Gardner contends this was not a formal grievance. (Gardner Decl. [#45-3], at 7.) Yet correspondence between Rodriguez and Fey in March of 2020 indicates that the complaint was treated as an official Level One Grievance at the request of Rodriguez. (Correspondence [#45-18], at 2.) Rodriguez ultimately rescinded her grievance once Gardner was no longer employed by CAST STEM. (Correspondence [#45-18], at 3.)

reinstatement as Principal of CAST STEM; (3) payment of outstanding funds due from the prior year and reinstatement of her salary at the principal level; (4) reimbursement of attorney fees; and (5) compensation for harm done personally and to her reputation.  Gardner contends that she was promised a $2,500 stipend the first year of her employment but that the stipend would increase to $5,000 once students arrived.  (Gardner Decl. [#45-3], at ¶ 4.)  Verstuyft maintains that the agreement was for a $2,500 stipend each year of employment.  (Verstuyft Aff. [#38-6], at ¶ 12; Email re: Employment Contract [#38-8], at 2; Stipend Records [#38-23], at 3.)  Gardner also complained that she was blocked from the District's online portal; the District concedes an error was made by a technology staff in suspending Gardner's email account rather than merely removing her from several principal groups; the mistake was corrected, and she was only suspended for 16 hours.  (Verstuyft Aff. [#38-6], at ¶ 14.)

A grievance hearing was held on August 7, 2020, after which Verstuyft issued a written response addressing Gardner's complaints and issuing a decision on her request for various remedies.  (Grievance Hearing Response [#38-28], at 1–10.)  Verstuyft denied Gardner's request for reversal of her reassignment and reinstatement as Principal due to the large number of grievances and personnel issues filed during her tenure as Principal at CAST STEM and the findings of Patterson during his third-party investigation.  (Grievance Hearing Response [#38-28], at 3–7.)  Verstuyft also concluded Gardner had been paid in full per her contract and was not ever promised a $5,000 stipend and was not entitled to attorney's fees, as the District did not feel that Gardner's decision to retain legal counsel was necessary.  (*Id.* at 8–9.)  Gardner withdrew her request for compensation for personal and reputational harm at the grievance hearing.  (*Id.* at 9.)

Meanwhile, Gardner filed this lawsuit on July 23, 2020. Then Gardner filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC")[7] on July 29, 2020, alleging race and color discrimination, a hostile work environment, and retaliation. (EEOC Charge [#38-4], at 1–2.)

Gardner was scheduled to report to work in her new position on July 31, 2020. (Verstuyft Aff. [#38-6], at ¶ 15.) On that day, she requested and received a medical leave of absence, and was approved for full-day FMLA leave through October 23, 2020. (*Id.*; FMLA Leave Approval [#38-26], at 1.) Gardner continued on temporary disability leave provided to educators by state law and board policy until January 26, 2021. (Verstuyft Aff. [#38-6], at ¶ 15; Temporary Leave Ltr. [#38-29], at 1.) At the end of her temporary disability leave, Gardner was provided with written notice that she had exhausted all leave available to her, and she did not return to work. (Verstuyft Aff. [#38-6], at ¶ 15.)

On February 1, 2021, Verstuyft sent Gardner written notice that on March 16, 2021, he would recommend her contract not be renewed for failure to return to work after exhausting all of her available leave days. (Verstuyft Aff. [#38-6], at ¶ 15; Verstuyft Ltr. [#38-30], at 1.) Gardner did not request a hearing under the Texas Education Code to contest the recommendation. (Verstuyft Aff. [#38-6], at ¶ 15.) On March 23, 2021, the Board of Trustees voted not to renew her contract, and Gardner's employment ended at the expiration of her 2020–2021 contract. (Verstuyft Aff. [#38-6], at ¶ 15; Nonrenewal Notice [#38-31], at 1.) Although Gardner requested she be reinstated to her position, the request was denied. Gardner did not amend her pleadings to address the non-renewal or the refusal of reinstatement or anything else that occurred after she filed her lawsuit and charge.

---

[7] The EEOC issued a Right to Sue Letter on October 21, 2020, at Gardner's request. (Right to Sue [#38-5], at 1.)

11

## IV. Analysis

The District seeks summary judgment on Gardner's remaining claims of race and color discrimination under Title VII. By these claims, Gardner contends the District subjected her to race and color discrimination by wrongfully demoting her and reducing her salary. The undersigned notes that, in her deposition, Gardner testified that all of her allegations of discrimination concern both her race, African American, and color, Black. (Gardner Dep. [#38-3], at 163:23–164:20.) Accordingly, the undersigned addresses Gardner's race and color discrimination claims collectively in this report and recommendation. For the reasons that follow, the Court should grant the District's motion.

**A.     This case is governed by the *McDonnell Douglas* burden-shifting framework.**

Title VII makes it unlawful for an employer to discharge an employee because of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016). Where a plaintiff offers only circumstantial evidence of discrimination, the *McDonnell Douglas* framework requires her to establish a *prima facie* case of discrimination, which, only if established, raises a presumption of discrimination. *See Rutherford v. Harris Cty., Tex.*, 197 F.3d 173, 179–80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). To establish a *prima* facie case of discrimination, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated or that she was replaced by someone outside her protected class. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).

If established, a plaintiff's *prima facie* case creates an inference of discrimination that shifts the burden of production to the defendant to come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Rutherford*, 197 F.3d at 180. This burden is one of production, not persuasion, and can involve no assessment of credibility. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Once the employer articulates a legitimate nondiscriminatory reason and produces competent summary judgment evidence in support of that stated reason, the inference of discrimination disappears, and the burden of proof shifts back to the plaintiff to demonstrate the employer's articulated reason for the adverse employment action was merely a pretext for discrimination. *Rutherford*, 197 F.3d at 180.

The District argues that Gardner offers only circumstantial evidence of discrimination in this case and cannot establish a prima facie case of discrimination because she was not subjected to an adverse employment action. The undersigned agrees with the District that Gardner has not offered any direct evidence of race and color discrimination. "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). "[S]tatements or documents which show on [their] face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003)). Such statements must be (1) related to the plaintiff's status as a member of a protected class, (2) proximate in time to the adverse employment action, (3) made by someone "with authority over the challenged employment decision," and (4) related to the challenged decision. *Eaglin v. Tex. Children's Hosp.*, 801 Fed.

13

App'x 250, 255 (5th Cir. 2020) (quoting *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015)).

Here, the only evidence offered by Gardner that references her race or color is the comment by Fey in a meeting in the fall of 2017 that Fey understood people like Gardner because she dealt with girls just like Gardner when she worked as a coach. (Gardner Dep. [#38-3], at 134:2–12.) Gardner's alleged reassignment and demotion did not occur until the spring of 2020. Fey's statement was not made proximate in time to the alleged adverse employment actions, and therefore cannot be direct evidence of discrimination. Accordingly, the *McDonnell Douglas* burden-shifting framework applies.

**B.     Assuming Gardner suffered an adverse employment action, she has failed to rebut the District's legitimate, nondiscriminatory reasons for her reassignment.**

The District challenges the third element of Gardner's *prima facie* case, arguing that she cannot establish she was subjected to an adverse employment action. Under Fifth Circuit jurisprudence, an adverse employment action in a Title VII discrimination case includes only "an ultimate employment decision, such as hiring, granting leave, discharging, promoting and compensating." *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 340 (5th Cir. 2003). Accordingly, Gardner concedes that the only possible adverse action at issue (that occurred prior to the filing of her charge and lawsuit) are her reassignment to a less prestigious and less lucrative position in the summer of 2020.

"[A] transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 613 (5th Cir. 2007) (internal quotation marks and citation omitted). "Whether the new position is worse is an objective inquiry." *Id.* at 613–14. Here, the District transferred Gardner from her position as principal of a specialty high school to assistant principal of a middle school, a position which plausibly holds

14

less prestige and responsibility. The record also establishes that this transfer was accompanied by a pay cut from a daily pay rate of $392.38 to $343.23. (Verstuyft Aff. [#38-6], at ¶ 2; Reassignment Ltr. [#38-25], at 1.) Accordingly, the undersigned has assumed without deciding that Gardner can prove she was subjected to an adverse employment action. (Gardner arguably would not, however, be able to prove she was treated less favorably or was replaced by someone outside her protected class, the fourth element of her *prima facie* case, but this is not the subject of the District's motion. Therefore, it is not addressed here.)

Gardner, however, cannot ultimately prevail on her race and color discrimination claims because the District has proffered a legitimate, nondiscriminatory reason for her reassignment, and Gardner has failed to produce competent evidence that this reason was pretext for unlawful discrimination. The District asserts that it had a legitimate business reason to reassign Gardner to a different position. The summary judgment record contains evidence of numerous subordinates and colleagues making informal complaints, submitting statements, and filing formal grievances against Gardner within a two-year period, all alleging Gardner created a hostile working environment and some requesting transfer to another school outside of Gardner's supervision. (Wilson Grievance [#45-7], at 1–5; Butler Ltr. [#45-11], at 1–10; Celestin Statement [#45-9], at 1–7; Robinson Grievance [#45-15], at 2–5; Peppas Grievance [#45-13], at 2–9; Porter Grievance [#45-17], at 2–13; Rodriguez Grievance [#45-18], at 6–8; Verstuyft Aff. [#38-6], at ¶ 7.) Additionally, the record reflects that the District hired a third-party investigator to look into the issues at CAST STEM High School, which resulted in a finding of a "troubling level of dysfunction at the campus leadership level" at the school and a recommendation to consider transfer, reassignment, nonrenewal, or termination of Gardner. (Verstuyft Aff. [#38-6], at ¶ 5; Patterson Report [#38-15], at 6.)

15

Gardner has not met her summary judgment burden to produce competent evidence that the District's stated business reasons for reassigning Gardner to another administrative position with the District were pretext for race and color discrimination. Gardner argues that the District's stated reasons for her reassignment were pretextual because many of the grievances were resolved in her favor and/or were not taken seriously by the District until this lawsuit was filed. Additionally, Gardner argues the District never coached her on improving her performance; the third-party investigation was a sham; she was never given an annual performance review; and no one at the District shared the results of the investigation with Gardner during her employment. Finally, Gardner argues that under her leadership CAST STEM High School was high performing with the highest test scores and state rating in the District.

There are several issues with Gardner's arguments. First, Gardner has not provided competent evidence to support the majority of her assertions. Rather, she offers only numerous self-serving and speculative statements in her declaration relating to the resolution of employee grievances and CAST STEM High School's performance history. Gardner has not provided the Court with any additional corroborating objective evidence to support the majority of her subjective assertions. This is not enough to survive summary judgment. *See Davis v. Farmers Ins. Exch.*, 372 Fed. Appx. 517, 519 (5th Cir. 2010) ("[S]elf-serving statements, however, are not competent summary judgment evidence and cannot create material issues of fact"); *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (Plaintiff's "self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact . . . .").

Moreover, even if some of Gardner's assertions regarding the resolution of employee grievances against her, for example, are supported by objective evidence (such as certain

grievances being at least partially resolved in her favor), it remains that a third-party investigation occurred, which found a "troubling level of dysfunction at the campus leadership level" and recommended consideration of transferring, reassigning, or terminating Gardner. (Patterson Report [#38-15], at 6–7.)   Gardner takes issues with various aspects of the third-party investigation.  But even if Gardner could show that the investigation was faulty in some way or even reached an incorrect conclusion, that is not enough to demonstrate pretext.  *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."). Thus, in the context of allegations of a flawed investigation, "a plaintiff must do more than show defendant's mistaken belief regarding the investigation's conclusions to survive summary judgment—plaintiff must show that defendant's belief was dishonest and masked a discriminatory purpose."  *Hinga v. MIC Group LLC*, 13-0414, 2014 WL 4273887, at *3 (S.D. Tex. Aug. 29, 2014) (citing *Swenson v. Schwan's Consumer Brands N. Am., Inc.*, 500 Fed. App'x 343, 346 (5th Cir. 2012); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993)).  The District has presented evidence that it believed the investigator and relied on the results of the Patterson investigation in making the decision to reassign Gardner to another position.  Gardner has not rebutted that evidence with any evidence calling into question the District's honesty or credibility with respect to that decision.

   Nor has Gardner come forward with any evidence from which a factfinder could infer that the District's reliance on the Patterson report was in fact pretext for an employment decision motivated by racial animus.  Again, the only evidence that could be interpreted as relating to Gardner's race in the summary judgment record is the deposition testimony regarding Gardner's conversation with Fey in the fall of 2017, an isolated conversation occurring years before

Gardner's reassignment. Additionally, Verstuyft, not Fey, was the ultimate decisionmaker in Gardner's reassignment, and there is no evidence related to Gardner's race concerning Verstuyft. Finally, there is "a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue." *Spears v. Patterson UTI Drilling Co.*, 337 Fed. App'x 416, 421–22 (5th Cir. 2009); *see also Kobaisy v. Univ. of Miss.*, 624 Fed. App'x 195, 199 (5th Cir. 2015). Verstuyft both recommended Gardner be hired as Principal of CAST STEM in 2017 and recommended she be reassigned to a new school in 2020.

In summary, Gardner has failed to provide the Court with competent summary judgment evidence undermining the veracity of the District's stated reasons for reassigning her to another school or evidence from which a factfinder could infer that the real reason for the reassignment was race discrimination. Because Gardner fails to provide sufficient evidence of pretext, the Court should grant the District's motion for summary judgment.

## V.  Conclusion and Recommendation

Having considered the District's motion, the response and reply thereto, the summary judgment record, and governing law, the undersigned recommends that Defendant's Motion for Summary Judgment [#38] be **GRANTED** as to Gardner's remaining claims of race and color discrimination under Title VII.

## VI.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be

filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Objections are limited to no more than 20 pages unless leave of court is granted.  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

    SIGNED this 11th day of May, 2023.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE